Filed 7/8/15  P. v. Seay CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>HAKEEM SEAY,<br><br>  Defendant and Appellant. | C073267<br><br>(Super. Ct. No. 09F03513) |

Defendant Hakeem Seay appeals his four convictions for committing a lewd and lascivious act upon a child age 14 who was at least 10 years younger than defendant.  He contends the trial court erred in refusing his request for substitution of retained counsel of his choice and by denying a reasonable continuance to permit retained counsel to prepare for trial.  Because proposed new counsel made clear they required a continuance and the request came on the day of trial, we find no abuse of discretion.

FACTS AND PROCEEDINGS

In January 2009, E.T. and G.K. were 14 years old. Defendant was almost 33 years old. On an early afternoon, E.T. and G.K. were walking home from the movies when they saw defendant sitting in a parked car. Defendant honked the horn and waved them over. They went up to the car and spoke with him. Defendant asked E.T. for her phone number. She did not have a phone, so she gave defendant G.K.'s number. During the conversation E.T. told defendant she was 14 years old. The girls left and walked back to G.K.'s foster home.

Beginning later that afternoon, and continuing into the evening, defendant and the girls exchanged text messages. Defendant told the girls he wanted to have sex with them. They arranged to meet at a nearby pizza parlor. The girls got in defendant's car, he drove them to a motel and rented a room. The girls went into the room and watched television while defendant left the room. He returned shortly with vodka and told the girls to drink the vodka. They drank some, but did not like the taste, so defendant got some soda to mix with the vodka. E.T. got sick from the alcohol and vomited.

The girls sat on separate beds in the room. Defendant took off his clothes and said he wanted to have sex with both girls. He asked E.T. if she wanted to have sex. She initially refused, but he gave her more vodka and she "gave in to it." Defendant touched E.T's vagina outside her clothing, then touched her breasts and genitals under her clothes. He also put her hands on his penis. He removed her clothing, put on a condom and they had sexual intercourse. E.T. fell asleep. Defendant then moved to G.K., touched her vagina outside her underwear, and had sexual intercourse with her.

Later, G.K. woke E.T. up to shower. After the shower, the girls came back into the room. Defendant had G.K. come over to his bed while E.T. watched television. He had sexual intercourse with G.K. again. G.K. was uncomfortable and told E.T. she wanted to leave. G.K. called one of E.T's foster sisters and asked her for a ride. E.T.

2

went back to bed and fell asleep again. When she woke up, G.K. was gone. Defendant had sexual intercourse with E.T. again.

G.K. was waiting outside the motel room for her ride. E.T's foster sister and mother arrived, went up to the room and banged on the door. Defendant told E.T. to hide in the bathroom. Then he answered the door and denied she was there. The women continued banging on the door calling for E.T. Defendant left the room. E.T's foster mother saw defendant leave and chased after him as he left the motel in his car, but she lost sight of his car.

When police arrived at the motel, they found an opened condom wrapper, an unopened condom, an empty bottle of vodka, and a used condom. There was a hole in the used condom. Sperm on the inside and outside of the condom matched defendant's DNA profile. A mixture of DNA on the outside of the condom matched the DNA profiles of each of the girls.

Defendant denied texting G.K. about having sex with her. He denied inappropriately touching either E.T. or G.K., and denied having sexual intercourse with them. He also denied wearing a condom or ejaculating in the motel room.

Defendant testified the girls told him they were 20 and 21 years of age. He said they had called him to pick them up at the pizza parlor and give them a ride somewhere. They appeared homeless and told him they had nowhere to go. He drove them to a motel and paid for the room because they had no money or identification. He also bought them alcohol and soda. He left the room and went down to his car. Because he was worried the girls would vandalize the room, he stayed in his car in the parking lot. He woke up around 1:00 a.m. and went back to the room. He sat on the bed with E.T, but G.K. approached him and sat on his lap. G.K. forced herself on him, touching his penis and pulling it out of his pants. He forcibly removed her from his lap. G.K. then approached E.T. and tried to touch her vagina. Defendant threw G.K. out of the room. This enraged G.K. and she ordered him to get in bed with her. He still refused and she called someone

3

to pick her up before leaving the room. Defendant heard someone knock at the door. E.T. told him not to answer. She appeared frightened so he told the people at the door E.T. was not there. Defendant then left the motel and went to his mother's house.

An information charged defendant with 10 counts of lewd and lascivious acts with a 14 year old child where defendant is at least 10 years older than the child. (Pen. Code, § 288, subd. (c)(1)--counts 1-6 and 10-13) and three counts of unlawful sexual intercourse with a minor (Pen. Code, § 261.5, subd. (d)--counts 7-9). A jury found defendant guilty of counts 2, 4, 5, and 10. The jury could not reach verdicts on the remaining counts, and the trial court declared a mistrial. The trial court dismissed these counts on the People's motion and sentenced defendant to an aggregate term of five years in prison.

DISCUSSION

I

*Request for Substitute Counsel*

Defendant contends the trial court erred by refusing his request for substitution of retained counsel of his choice and by denying a reasonable continuance to permit retained counsel to prepare for trial.

These offenses occurred in January 2009. Defendant was arraigned in May 2009. Following the denial of a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)), Peter Kmeto was retained as counsel in August 2009. Between November 20, 2009, and January 20, 2011, the preliminary hearing was continued and reset 12 times. The People filed an amended information on January 20, 2011, and defendant waived preliminary hearing that same day. Between January 20, 2011, and November 13, 2012, the trial date was vacated and reset 11 times. Some of the continuances were at defense counsel's request and some were at the People's. The People filed another amended information on April 12, 2012.

4

Defendant appeared for a trial readiness conference on November 13, 2012, and confirmed the trial date of November 27, 2012. On November 27, defendant informed the court he wanted to substitute retained counsel, Kmeto, for new retained counsel Katherine Lothrop and Denise Henderson. We note that throughout his brief, defendant refers to his attorney, Peter Kmeto as a deputy public defender and the hearing to relieve Kmeto as a *Marsden* hearing. The record indicates at the first hearing, the public defender's office was appointed and then relieved and conflict counsel was appointed. Conflict counsel was relieved on August 21, 2009, and Kmeto was retained.

Kmeto stated he was not ready for trial. The People objected to any continuance, noting the many prior continuances and indicating there were two victim witnesses in the case. "One of them is a foster child who has a chronic run-away history. She is currently in placement. I currently have her available. Any continuance would jeopardize my ability to put this case on."

Kmeto advised the court that "given the results of the DNA testing," he and defendant had "an irreconcilable difference in terms of what it is his defense should be. There has--this has expanded into a conflict between the two of us to the point where he no longer has any faith in what my opinion is as to what the strategy should be, and I do not feel comfortable in putting on the defense that [defendant] wishes me to. [¶] It's just one of those cases, and I understand the district attorney is objecting to this, but they have their witnesses under subpoena. [Defendant] has a right to a trial with an attorney of his choosing, with a defense of his choosing, and I honestly cannot say that in good faith that I would be able to put that defense on."

The court asked if proposed counsel was ready to go forward. She indicated she was not. She had reviewed the discovery and discussed some of it with defendant. She would request a 30-day continuance. The court asked, "If that request is denied and the case is set for trial earlier than that because it is an old, old case . . . [¶] . . . [¶] . . . I understand. But you want to come in. Mr. Kmeto says that it's a dispute over what the

5

defense is, and I understand that is what Mr. Kmeto is saying; however, just because the defendant wishes to hire a new attorney on the day that the case is set for trial doesn't mean that he gets his case continued. [¶] What's the earliest you would be available for trial?"

Lothrop responded, "The problem is there are records that need to be requested. It's a matter of some dependency records that need to be requested and school records and everything for these foster victims. [¶] As soon as those come in, I believe we could be ready. So it's kind of dependent on what investigation--I'm not sure what investigation has been done, but there appears to be some things that need to be done in the case so we can get going as fast as possible." The court asked when she could be prepared for trial without procuring additional discovery. Lothrop indicated she could not go to trial with only the existing discovery.

The discussion moved to chambers. Kmeto indicated it was his opinion that defendant's only viable defense was that defendant had a reasonable belief the girls were adults. Kmeto's initial defense strategy was to deny anything had occurred at all, in part because there was no rape kit. For about a year and a half, defendant denied any sexual activity with the girls at all. Then, believing it would absolve him, defendant insisted on having the DNA testing done. Instead of exonerating him, the test results showed defendant's DNA in the condom and the two victims epithelial cells from vaginal intercourse. Kmeto consulted with a colleague on the DNA evidence and concluded there was no basis on which to contest the DNA results. Those DNA results became available in approximately May 2011, about a year and a half before the November 27, 2012 scheduled trial date.

In the three weeks immediately prior to the trial date, defendant had become "entrenched with this notion that his defense is that--that in fact he was attacked, that he had no--that he had no intent to engage in any sexual--and, in fact, he did not engage in any sexual activity." Kmeto was not prepared for such a defense. He had not

6

investigated the girls "to see whether they have some weird sexual proclivities or anything like that; whether they have been involved in that sort of activity." Based on the DNA results, Kmeto concluded, and prepared for a trial, in which defendant's best defense was that defendant had a reasonable belief the victims were adults. He was prepared to go to trial on that defense, and not the one defendant wanted. Like proposed new defense attorneys, if he were to put on that defense, he would also need the girls' Child Protective Services (CPS) records.

The court asked Kmeto, assuming the girls had behavioral problems, if defendant's preferred defense was a viable defense strategy. Kmeto responded he was not prepared to move forward on defendant's strategy "and I do believe he has a right to present his own strategy regardless of what the odds are that he will be successful." Kmeto also observed, "if I were to make an opening statement based on what I believe the defense ought to be and then the client, of necessity, takes the witness stand, and then he will . . . roll over to *it wasn't me*. . . . I will have undercut him with my opening statement, and so for me to be able to effectively represent him on his theory, I--I'm not prepared to do that. I would just have to basically give no opening statement, put him on the witness stand, and--and then try to cobble something together as a closing argument, and I just don't think that that is--that that would be appropriate."

In open court, the court advised defendant, "you have a right at any time to substitute and hire whatever attorney you choose; however, that does not mean that the Court would grant a continuance. . . . [¶] . . . In other words, I would not necessarily continue the case for the new attorneys to substitute in to become prepared or to conduct additional discovery." Defendant indicated he understood. The court asked defendant if he still wanted new counsel if the matter was only continued for a few weeks, understanding the new attorneys might not feel prepared to go forward at that point. Defendant indicated he did still want to substitute counsel. The court noted the case was quite old, with numerous continuances on both sides, and that the prosecutor had

indicated there was a potential for witness problems, including that at least one of the victims was a serious runaway risk. The court made clear it would not grant a 30-day continuance, and that counsel might not have adequate time to prepare. "So the question is, keeping that in mind, do you still wish to have the new attorneys?" Defendant stated he did.

The court then stated it would relieve Kmeto, and Lothrop and Henderson would be the attorneys of record. The court then asked Henderson, "Do you wish to accept the case before I make that final--do you wish to accept the case understanding that I am going to set a trial date here in December within the next couple of weeks?" Henderson stated, "We cannot accept this without a minimum of 30 days. There is--I think that was probably the minimum amount of time we would need based on what we know of this case. [¶] My understanding is the DNA has not been tested." The court acknowledged the DNA had not been retested, but that Kmeto had consulted with experts in the area and "the defense that is being put forward would not need the testing of that information." Henderson responded, "My understanding, Your Honor, is that the DNA is the sole issue in this case." Counsel and the court had an unreported sidebar conference. The court then informed defendant, "I am not going to relieve Mr. Kmeto at this time. [¶] What has been represented to the new defense counsel is something that I discussed in chambers with Mr. Kmeto. It's absolutely in conflict with what Mr. Kmeto understands that you have been requesting of him, that is, the new attorney's argument--it just does not make sense." The courtroom was cleared, to facilitate further discussion between the court, defendant, Kmeto, and Henderson.

Kmeto reiterated the defense defendant wanted to put forward was that he had not engaged in sexual activity with the girls. The court noted, there was a condom with DNA indicating defendant had had sexual intercourse with the victims. The court went on, "Mr. Kmeto's understanding of the conflict between you and he is that you wanted to put on a defense that the victims used force or violence against you and forced you into

8

sexual activity.  [¶]  Your new proposed attorneys don't understand that that is the defense that you want to put on.  [¶]  So you are going to have to decide what you want to do, and how you want to handle your case.  [¶]  So my only advice to you is you're going to have to think about what you want to do and how you want to handle your case.  [¶] You do have a right to hire--listen to me.  [¶]  You have a right to hire an attorney of your choice; however, the Court at this late stage does not have--can exercise its discretion and does not have to grant you the request to substitute out Mr. Kmeto to bring in other attorneys especially where what you are trying to do seems to not make sense.  [¶]  On the one hand to say it's not me and then physically there be evidence that it is you--I don't want you to say anything, sir.  I am just telling you.  You have got to decide what you want to do and where you want to go.  [¶]  I'm not going to grant a continuance in the case to bring in new attorneys to spend all of the time that they might need legitimately to become prepared and to explore avenues, and then for you to change your mind and go elsewhere.  [¶] . . . [¶]  So you get to choose who you want to represent you, but the Courts get to decide whether we delay your case or not for those new attorneys to substitute in.  [¶]  I want you to listen to this last thing:  [¶] You have got to think about what you really want to do with your defense.  [¶]  The second thing is if--I am not willing to put your case out until January to go forward.  So I want you to understand something:  You need to figure out what do I really need from my new attorneys if I am going to hire them because I don't think, from my understanding of the case, other minds might differ, that getting a new expert or having a DNA expert is going to change anything factually about the case.  [¶]  It is a pretty stable science.  Quite often, and I have done numerous, numerous DNA sexual assaults and homicides where DNA is physically present, and even where there are attributes in the DNA discovery, alleles that are unexplained, problems in some of the scientific testing, rarely does the defense bring in their own expert; one, because it's very expensive; and, two, the experts, because of the science, tend to agree as to the result, what it means.  If there is an error in the testing

9

or if there is a convoluted mixture of DNA, they tend to agree as to what that means in a scientific sense. So rarely, do they ever bring one in. [¶] It's my understanding that there is no conflict as to the DNA results or the manner in which it was tested. So it would only prolong the case. To bring in another expert would not change the legal defense or the legal result from what this evidence is. [¶] So I am going to bring in the parties, but you need to get it together to decide what you want to do understanding that I am not going to be putting the case out into January to put on evidence that is unlikely or to seek out evidence that is unlikely to have any chance of changing the defense in your case."

In open court, the trial court stated, "I am not releasing Mr. Kmeto at this time based on what has been presented to me as the conflict between Mr. Kmeto and [defendant.] It may be a defense in the defendant's mind, but the science would indicate otherwise, and I don't think that conflict would change if new counsel came in because I think the science will be there. I'm not talking about CPS. I am talking about the DNA issue and whose DNA it is." The matter was trailed for two more days. The court suggested defendant speak with Kmeto and the proposed new attorneys and decide on a defense.

On November 29, 2012, the parties appeared in court again. Kmeto reiterated the prior proceedings and clarified that further discussions revealed, Kmeto's expressed understanding of the conflict between himself and defendant was correct. That is, defendant wanted to assert the girls had attacked him and deny he had had sexual intercourse with them. Proposed new counsel was prepared to proceed to trial within three weeks. Kmeto further noted communications between himself and defendant continued to deteriorate. He also noted that while the prosecution argued time was of the essence because the witnesses are dependent children who are chronic runaways that was a fact which has been true throughout the case. Moreover, the witnesses had been interviewed, and were cooperative with the prosecution. There was no reason to believe

10

they would not be available in three weeks time. Accordingly, Kmeto did not believe the prosecution would be prejudiced by a three-week continuance.

The prosecution responded, "every day this case is continued will jeopardize my ability to put on a case." He noted both victims had a history of running away. In fact, one had an extensive history of running away, had never been in a placement for a long time, had run away about six weeks before the scheduled trial date and was gone for over a month. She turned herself into the receiving home in mid-November. She was under subpoena and was cooperative to the extent that she was planning to come to court while under subpoena, but if she was on the run he did not believe he would be able to find her. He also noted a continuance of a few weeks would likely result in additional continuances for longer periods of time.

Henderson stated as new counsel they would need a continuance until December 20. They had received the file from Kmeto and there had been no investigation, so they would immediately subpoena the CPS records and the officers. She asserted there were 20 to 30 witnesses that had not been contacted. She argued the conflict between Kmeto and defendant should have been raised at the trial readiness conference. She reported defendant did not know the elements of the offense, his potential exposure, or possible defenses. She thought it might be possible the case could be resolved if he were given that information. Kmeto agreed the continuance should be granted to permit substitute counsel, because he and defendant just did not see "eye-to-eye."

The court noted Kmeto was a very competent, thorough, and excellent trial attorney. The court stated there was a disparity between the conflict Kmeto had described as to the defense defendant wanted to offer and what defendant was communicating to Henderson and Lothrop. The court found, "I see a defendant that is getting cold feet on the day of trial and is arguing an alternative ground for which--from what I understand, he's not communicated to his attorneys."

11

The trial court denied the motion. The trial court found the request was untimely. "The case has been around for years. The issue that he has raised, as represented by Mr. Kmeto in chambers . . . [¶] . . . and what [proposed new counsel are] purporting the defense to be is no different than ones that were originally raised with Mr. Kmeto and that are part of what I understand to be his theory of his defense, as opposed to one that raised the conflict that Mr. Kmeto says arose . . . [¶] Therefore, . . . I find that it is untimely."

Later that afternoon, the parties appeared before Judge Burger-Plavan. Defendant renewed his request to relieve Kmeto and substitute new counsel. Kmeto indicated proposed new counsel was in court and were "willing to make whatever representations that are necessary to the Court concerning their willingness to accept the case and their willingness to try the case within the next three weeks." He advised the court the reason for the request has "to do with tactics as to how the defense would be presented" and that defendant no longer had confidence in Kmeto's abilities or willingness to put on a defense defendant believed was in his best interest. He noted the prosecutor vigorously objected to the substitution as one of the witnesses is a foster child prone to running away, and a continuance would increase the risk of her not appearing at trial. After reviewing the procedural law, Judge Burger-Plavan noted there was nothing presented which would constitute changed circumstances or new evidence.

II

*Request for Continuance*

Defendant contends the trial court erred in denying his request for substitution of counsel. He contends the record fails to support the court's refusal to grant the substitution of counsel and relatedly, the record does not support the trial court's denial of his request for a reasonable continuance to permit substitute counsel to prepare for trial. We find no abuse of discretion.

12

"The right of a nonindigent criminal defendant to discharge his retained attorney, with or without cause, has long been recognized in this state. . . ." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*).) A defendant may discharge appointed counsel only if that lawyer is rendering inadequate representation or there exists an irreconcilable conflict between counsel and client. (See *Marsden, supra,* 2 Cal.3d at p. 123; *People v. Lara* (2001) 86 Cal.App.4th 139, 151 (*Lara*).) A defendant represented by retained counsel, on the other hand, may discharge retained counsel at any time with or without cause. (*Lara,* at p. 152.)

"Because the right to discharge retained counsel is broader than the right to discharge appointed counsel, a *Marsden*-type hearing at which the court determines whether counsel is providing adequate representation or is tangled in irreconcilable differences with the defendant is ' " [an] inappropriate vehicle in which to consider [the defendant's] complaints against his retained counsel." ' [Citations.] Instead, under the applicable test for retained counsel, the court should 'balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.' [Citation.] In so doing, the court 'must exercise its discretion reasonably: "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." ' [Citations.]" (*People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 (*Keshishian*).)

The right to discharge retained counsel, however, is not absolute. The trial court is entitled to consider the stage of the proceedings at which the request is made, and the effect the substitution will have on "orderly and expeditious" judicial administration. The trial court may deny a request for substitution of counsel if the request "is not timely, i.e., if it will result in 'disruption of the orderly processes of justice.' " (*Ortiz, supra*, 51 Cal.3d at pp. 983-984.) If the defendant has been " 'unjustifiably dilatory' " in making the request or it appears defendant " 'arbitrarily desires to substitute counsel at the time of trial.' [Citations.]" (*Lara, supra,* 86 Cal.App.4th at p. 153) "[T]he 'fair

13

opportunity' to secure counsel of choice provided by the Sixth Amendment 'is necessarily [limited by] . . . the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time." ' " (*Ortiz, supra*, 51 Cal.3d at pp. 983-984.)

In the case of an untimely motion to discharge retained counsel, we apply the abuse of discretion standard on appeal. (See, e.g., *Lara, supra,* 86 Cal.App.4th at pp. 153-155, 165-166.) "A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.) Moreover, as the reviewing court, we imply all findings reasonably supported by the record supporting the trial court's ruling. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.)

The stage of the proceedings at which the motion is made can affect its timeliness. (*People v. Munoz* (2006) 138 Cal.App.4th 860, 867.) Here, defendant's request was made on the scheduled trial date. Numerous courts have held a request to discharge appointed counsel is untimely when made on the first day of trial. (*Keshishian, supra*, 162 Cal.App.4th at p. 429 [request to discharge appointed counsel untimely when "made on the day set for trial after the case had been pending for two and a half years"]; *People v. Hernandez* (2006) 139 Cal.App.4th 101, 109 [request properly denied where made "almost immediately before jury selection was to begin"]; *People v. Turner* (1992) 7 Cal.App.4th 913, 919 [request made on the day of trial was untimely]; *People v. Lau* (1986) 177 Cal.App.3d 473, 479 [request untimely when made "the moment jury selection was to begin"].) It is well settled " '[t]he right to counsel cannot mean that a defendant may continually delay his day of judgment by discharging prior counsel.' " (*Keshishian, supra*, 162 Cal.App.4th at p. 429.) Moreover, defendant had appeared in

14

court two weeks before the scheduled trial date and made no mention of a conflict or desire to substitute counsel.

We also disagree with defendant's reading of some of the court's comments, specifically related to whether the proposed defense "made sense." Defendant is correct that his right to be represented by counsel of his choice did not depend on "whether the trial court agreed or disagreed with the defense [defendant] wanted to present at trial." But, we do not read the trial court's comments as a statement that it was denying the request based on its view of the proposed defense strategy. Rather, the court was commenting on the differences between Kmeto's understanding of defendant's desired defense and Henderson's understanding of the desired defense and that that variance "just does not make sense." We read those comments as expressing doubt about the credibility of defendant's change of heart regarding trial strategy and a concern that the same issues would arise again even with the substitution of counsel. The court made clear to defendant because of this disparity between what counsel understood as the defense strategy, "I'm not going to grant a continuance in the case to bring in new attorneys to spend all of the time that they might need legitimately to become prepared and to explore avenues, and then for you to change your mind and go elsewhere." Given the disparity between what defendant had communicated to Kmeto and Henderson as his desired defense, the court concluded defendant was "getting cold feet on the day of trial and [was] arguing an alternative ground for which--from what I understand, he's not communicated to his attorneys." It was reasonable in these circumstances for the court to infer defendant would purport to support one defense strategy and on the eve of trial seek substitution of counsel to pursue a different defense.

At the time defendant made his motion, this case had been pending for approximately three and a half years. Between November 2009 and November 2012, the matter had been continued some 23 times. Defendant and Kmeto initially formulated a defense denying any sexual contact between defendant and the victims. This strategy

15

lasted until defendant insisted on procuring DNA evidence.  The DNA results required a change in defense strategy.  Those results were available for a year and a half before the scheduled trial date.  For almost a year and a half, defendant and Kmeto had been building a defense that sought not to challenge the DNA evidence, but to explain it.  Three weeks before trial, defendant claimed he wanted to change defense tactics again and revert to his claim he did not have sexual intercourse with the girls.  He wanted to claim the girls had attacked him.  This new defense would have required additional investigation by defense counsel, including witness interviews and obtaining various records from CPS.  Henderson indicated there were 20 to 30 witnesses that needed to be contacted, in addition to subpoenaing CPS records.

The prosecution also expressed a real and justifiable concern regarding the possibility of losing one of the victims as a witness.  Although both girls were under subpoena, they were both chronic runaways.  In fact, one of the victims had never been in a placement for long.  She had run away about six weeks before the scheduled trial date and was gone for over a month.  The prosecution did not agree to any continuances after this event.

The court repeatedly clearly indicated defendant was entitled to the attorneys of his choice.  He was not, however, entitled to a continuance.  Proposed new counsel repeatedly made equally clear they could not take the case on without a continuance.  The hearing here had some markers of a *Marsden* type hearing, with discussions about the adequacy of Kmeto's representation and the irreconcilable conflict between defendant and Kmeto.  Ultimately, however, the trial court denied the request after considering the appropriate factors, balancing defendant's interest in new counsel against the orderly process of justice.  Here, the record demonstrates the court evaluated defendant's reasons for wanting to discharge appointed counsel and balanced those reasons with the disruption flowing from substituting new counsel.  We presume the trial judge knew and applied the correct legal standards.  (*People v. Gutierrez* (2009) 174 Cal.App.4th 515,

16

527.)  The untimely nature of the request made on the scheduled trial date, the numerous previous continuances requested by both sides, the necessity of yet another continuance to permit counsel to prepare, and the concerns regarding the prosecution losing key witnesses were appropriate considerations in denying defendant's motion.  Accordingly, we find no abuse of discretion.

DISPOSITION

The judgment is affirmed.


      HULL      , J.


We concur:


      NICHOLSON    , Acting P. J.


      BUTZ      , J.